Felicia Medina (SBN 255804)
fmedina@medinaorthwein.com
Jennifer Orthwein (SBN 255196)
jorthwein@medinaorthwein.com
MEDINA ORTHWEIN LLP
1322 Webster Street, Suite 200
Oakland, CA 94612
Telephone: (510) 823-2040
Facsimile: (510) 217-3580

*Attorneys for Plaintiff Lori Jespersen*

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| LORI JESPERSEN,<br><br>**Plaintiff,**<br><br>v.<br><br>CALIFORNIA DEPARTMENT OF CORRECTIONS AND REHABILITATION; SCOTT KERNAN; ROBERT FOX; STEVE PRYOR; DAN CUEVA; JOAN GERBASI; JACKIE CLARK; JOSEPH DINTINO; ANTHONY LEE; FELIX HOPPER; THOMAS HUNTLEY; TIA MCDANIELS; and DOES 1-50, INCLUSIVE,<br><br>**Defendants**. | Case No.:<br><br><br>**COMPLAINT FOR DAMAGES PENALTIES AND INJUNCTIVE RELIEF** |

Plaintiff Dr. Lori Jespersen ("Plaintiff" or "Dr. Jespersen"), by and through her attorneys, Medina Orthwein LLP, brings this action against the California Department of Corrections and Rehabilitation ("CDCR") and where applicable, Scott Kernan, Robert Fox, Steve Pryor, Dan Cueva, Joan Gerbasi, Jackie Clark, Joseph Dintino, Anthony Lee, Felix Hopper, Thomas Huntley, Tia McDaniels, and Does 1-50, inclusive, (all together, "Defendants") for violations of federal and state anti-discrimination, anti-harassment, and anti-retaliation laws.  Defendants have retaliated against Dr. Jespersen and endangered her personal safety for filing complaints regarding unlawful human rights violations concerning transgender and gay prisoners, including transgender and gay prisoners of color, and for taking protected medical leave.  Dr. Jespersen alleges upon knowledge concerning her own acts and upon information and belief as to all other matters.

## I.   INTRODUCTION

1.     CDCR has a long, sordid history of committing and permitting systemic human rights abuses that are prohibited by law.  This is particularly problematic considering CDCR is the second largest corrections facility in the United States.  At present, CDCR provides health care services to approximately 129,000 prisoners in 35 prisons and 43 conservation camps throughout the State of California, and oversees over 9,000 medical care positions.

2.     Two class-action lawsuits, *Plata v. Schwarzenegger and Coleman v. Brown*, were brought against CDCR challenging the constitutionality of CDCR's medical and mental health care.

3.     In *Plata v. Schwarzenegger,* the Court found CDCR's prison medical conditions were in violation of the Eighth Amendment of the United States Constitution's prohibition against cruel and unusual punishment.  Case Nos. C01-1351 THE, 2005 U.S. Dist. LEXIS 43796, 2005 WL 2932243 (N.D. Cal, 2005).  After repeated violations of a stipulated agreement and an order for injunctive relief, CDCR was held in civil contempt and its health care system was also placed in a receivership administered by the federal government (the "Federal Receiver" or "Receiver") in 2006.

4.     Concurrent with *Plata*, in *Coleman v. Brown*, CDCR's mental health service arm was also found to have violated the Eighth Amendment of the U.S. Constitution's prohibition against cruel and unusual punishment.  Case No. 2:90-cv-0520 LKK DAD (PC), 912 F. Supp. 1282 (E.D. Cal, September 13, 1995).  The *Coleman* court appointed a special master who to-date monitors and reports on CDCR's compliance with applicable guidance.   While *Coleman* was in active litigation, the special master submitted 16 interim reports, with later reports showing a troubling reversal in the progress of the remedial efforts of the preceding decade.

5.     CDCR remains under the control of the Federal Receiver.   Upon information and belief, CDCR regularly engages in data and information cover-ups to regain control from the Federal Receiver of certain prison sites and services.   CDCR retaliates swiftly and sternly against whistleblowers, like Dr. Jespersen, who have refused to remain silent even when their own personal safety is threatened.

6.     Human rights abuses remain rampant in California prisons, particularly for Lesbian, Gay, Bisexual, Transgender, and Queer ("LGBTQ") people and particularly LGBTQ people of color, who are some of the most marginalized and targeted people in the prison system.

7.     Under Governor Jerry Brown's 2017-2018 budget, CDCR is attempting to regain control over the inpatient psychiatric programs previously run by the Department of State Hospitals.  Many mental health practitioners in the Department of State Hospitals have serious concerns regarding the transfer of care to CDCR because CDCR remains ill equipped to abide by constitutional requirements to provide adequate psychiatric and medical care.

8.     CDCR is well aware transgender people experience gender dysphoria, a severe psychiatric condition that causes anxiety and depression, as well as increased risk for self-harm, suicide, and assault.   This is particularly true in CDCR prisons where transgender prisoners are housed and treated inconsistently with their gender identity, therefore compounding trauma and the symptoms of gender dysphoria.

9.     Yet, CDCR continues to foster an atmosphere that is hostile towards members of the LGBTQ community and an environment that encourages and condones abuse.   CDCR's homophobic and transphobic environment stems from the violent, discriminatory, harassing and derogatory behavior of CDCR's leadership, policies and practices, staff, and prisoners, whose egregious behavior CDCR knowingly ratifies.

10.     As detailed further below, CDCR and its employees have actively degraded and dehumanized its LGBTQ community by jeopardizing their privacy and safety, verbally assaulting and endangering gay and transgender patients, and interacting with LGBTQ patients and employees in blatantly discriminatory and hostile ways.

11.     All such inhumane treatment and actions are prohibited by law, chiefly, the Prison Rape Elimination Act ("PREA") and the Health Insurance Portability and Accountability Act ("HIPAA"), as well as the United States Constitution.

12.     To remedy these conditions and to improve the overall quality of CDCR's health care, Dr. Jespersen, an openly genderqueer lesbian Clinical Psychologist at the California Medical Facility in Vacaville, has actively brought these violations to the attention of CDCR leadership.

13.     Since July 2014, Dr. Jespersen has filed several complaints in which she identified, in detail, the mistreatment of LGBTQ prisoners at the California Medical Facility and the manner in which she has been harassed for her own protected classification, as well as her association with and her advocacy on behalf of protected groups.

14.     Despite Dr. Jespersen's efforts, CDCR has failed to remedy its mistreatment of LGBTQ prisoners in the California Medical Facility (Vacaville, CA), which is part of CDCR.

15.     Upon information and belief, CDCR did not conduct formal investigations into most of Dr. Jespersen's complaints or discipline the individuals responsible for the harassment of LGBTQ patients.

16.     Instead, CDCR retaliated against Dr. Jespersen.   The shocking nature of

CDCR's retaliation against Dr. Jespersen—***trapping her in units with notoriously dangerous prisoners, soliciting prisoners to harm her, and more***—forced Dr. Jespersen to take medical leave from June 1, 2016 through June 28, 2016.

17.     Adding insult to further injury, when Dr. Jespersen returned from protected medical leave, CDCR further retaliated against her by demoting her to an administrative role wherein she cannot clinically treat patients and wherein her safety remains in danger.

18.     Dr. Jespersen brings claims under the First and Fourteenth Amendments to the United States Constitution; Title VII of the Civil Rights Act of 1964, 42 U.S.C. Section 2000e *et seq*., as amended; the Family Medical Leave Act, 29 U.S.C. Section 2601, *et seq*. ("FMLA"); 42 U.S.C. Section 1983; the California Fair Employment and Housing Act, Cal. Govt. Code Section 12940 *et seq*., ("FEHA"); California Family Rights Act, Cal. Govt. Code Sections 12945.1 and 12945.2 *et seq*. ("CFRA"); and Cal. Labor Code Section 1102.5, *et seq*.

## II.     THE PARTIES

19.     **Plaintiff Dr. Lori Jespersen** is a current CDCR employee who, at all times relevant to this action, lived and worked in the State of California.  In March 2008, Dr. Jespersen joined CDCR as a Clinical Psychologist/Clinical Case Manager in the California State Prison in Sacramento, California.   In 2009, she transferred to the California Medical Facility in Vacaville, California.

20.     **Defendant CDCR** is a public entity that receives both state and federal funding.   CDCR's principal place of business is in California, with headquarters in Sacramento, California.

21.     **Defendant Scott Kernan** ("Kernan") is the Secretary of the California Department of Corrections and Rehabilitations and is responsible for overseeing CDCR, California's correctional agency, and participated in the Federal oversight of California's prisons.  Upon information and belief, Defendant Kernan is a resident of California.  In his position as Secretary, Defendant Kernan has ultimate responsibility and authority for the operation of the CDCR, including the administration and execution of policies and

procedures, as well as state and federal laws governing employees and prisoners. Defendant Kernan is sued here in his official capacity (for injunctive and declaratory relief) and in his individual capacity (for damages) based on actions, inaction, or conduct taken or performed under the color of state law.

22.     **Defendant Robert Fox** ("Fox") is or was the Warden of California Medical Facility (CMF).  Upon information and belief, Fox is a resident of California.  As Warden, Defendant Fox has ultimate authority over CMF, including the administration and execution of policies and procedures, as well as state and federal laws governing employees and prisoners.  Defendant Fox is sued here in his official capacity (for injunctive and declaratory relief) and in his individual capacity (for damages) based on actions, inaction, or conduct taken or performed under the color of state law.

23.     **Defendant Steve Pryor** ("Pryor") is or was the Associate Warden at CMF. Upon information and belief, Pryor is a resident of California.  As Associate Warden, Defendant Pryor is the second in command and has authority over CMF, including the administration and execution of policies and procedures, as well as state and federal laws governing employees and prisoners.  Defendant Pryor is sued here in his official capacity (for injunctive and declaratory relief) and in his individual capacity (for damages) based on actions, inaction, or conduct taken or performed under the color of state law.

24.     **Defendant Dan Cueva** ("Cueva) is or was the Associate Warden at CMF. Upon information and belief, Defendant Cueva is a resident of California.  As Associate Warden, Defendant Cueva is the second in command and has authority over CMF, including the administration and execution of policies and procedures, as well as state and federal laws governing employees and prisoners.  Defendant Cueva is sued here in his official capacity (for injunctive and declaratory relief) and in his individual capacity (for damages) based on actions, inaction, or conduct taken or performed under the color of state law.

25.     **Defendant Joan Gerbasi ('Gerbasi")** is or was the Chief of Mental Health, Acting Chief Executive Officer (CEO) of CMF and Dr. Jespersen's direct supervisor.

Upon information and belief, Defendant Gerbasi is a resident of California.  Defendant Gerbasi has direct supervisory responsibilities over Dr. Jespersen and as Acting CEO of CMF and Chief of Mental Health, she had the authority over operations at CMF related to mental health employees and prisoners, including the administration and execution of policies and procedures, as well as state and federal laws governing employees and prisoners.  Defendant Gerbasi is sued here in her official capacity (for injunctive and declaratory relief) and in her individual capacity (for damages) based on actions, inaction, or conduct taken or performed under the color of state law.

26.   **Defendant Jackie Clark** ("Clark") is or was the Chief Executive Officer (CEO) of the CMF.   Upon information and belief, Defendant Clark is a resident of California.  As CEO of CMF, she had the authority over operations at CMF related to mental health employees and prisoners, including the administration and execution of policies and procedures, as well as state and federal laws governing employees and prisoners.  Defendant Clark is sued here in her official capacity (for injunctive and declaratory relief) and in her individual capacity (for damages) based on actions, inaction, or conduct taken or performed under the color of state law.

27.   **Defendant Joseph Dintino** ("Dintino") is or was a Senior Psychologist at the California Medical Facility.  Upon information and belief, Defendant Dintino is a resident of California.   Defendant Dintino was Dr. Jespersen's direct supervisor.  Defendant Dintino is sued here in his official capacity (for injunctive and declaratory relief) and in his individual capacity (for damages) based on actions, inaction, or conduct taken or performed under the color of state law.

28.   **Defendant Anthony Lee** ("Lee") is or was an Investigative Services Unit (ISU) Lieutenant.   Upon information and belief, Defendant Lee is a resident of California.  As a Lieutenant of the ISU, Defendant Lee is responsible for overseeing the management of prisoner and employee Prison Rape Elimination Act (PREA) reports and investigations, and ensuring policies and procedures governing prisoners and Custody staff are followed.  Defendant Lee is sued here in his official capacity (for injunctive and

declaratory relief) and in his individual capacity (for damages) based on actions, inaction, or conduct taken or performed under the color of state law.

29.     **Defendant Felix Hopper (**"Hopper") is or was an Investigative Services Unit Officer.  Upon information and belief, Defendant Hopper is a resident of California.  As an ISU officer, Defendant Hopper is responsible for investigating prisoner and employee PREA reports.  Defendant Hopper is sued here in his official capacity (for injunctive and declaratory relief) and in his individual capacity (for damages) based on actions, inaction, or conduct taken or performed under the color of state law.

30.     **Defendant Thomas Huntley** ("Huntley") is a Captain in the Custody Department.  Upon information and belief, Defendant Huntley is a resident of California.  Upon information and belief, Defendant Huntley is a resident of California.   As a Captain, Defendant Huntley was responsible for the supervision of correctional staff.  Defendant Huntley is sued here in his official capacity (for injunctive and declaratory relief) and in his individual capacity (for damages) based on actions, inaction, or conduct taken or performed under the color of state law.

31.     **Defendant Tia McDaniels** ("McDaniels)" is a Correctional Officer at the California Medical Facility.  Upon information and belief, Defendant McDaniels is a resident of California.  As a Correctional Officer, Defendant McDaniels was responsible for protecting the safety of prisoners and employees and is subject to the policies and procedures related to prisoners and employees.  Defendant McDaniels is sued here in her official capacity (for injunctive and declaratory relief) and in her individual capacity (for damages) based on actions, inaction, or conduct taken or performed under the color of state law.

32.     Dr. Jespersen is ignorant of the true names and capacities of Defendants sued herein as DOES 1-50, inclusive and therefore sues these Defendants by such fictitious names.  Dr. Jespersen will amend this complaint to allege true names and capacities when ascertained.  Dr. Jespersen is informed and believes and thereupon alleges that each of the fictitious and named is responsible in some manner for the

occurrences here alleged, and that Dr. Jespersen's injuries as she herein alleges were proximally caused by the acts of these Defendants.  For convenience, each reference to any of the named Defendants herein shall also refer to Does 1 through 50, inclusive.

33.     Dr. Jespersen is informed and believes and thereon alleges that Defendants, and each of them, were and are the agents, employees, partners, joint ventures, co-conspirators, owners, principles and/or employers of the remaining Defendants, and at all times herein mentioned were and are acting within the course and scope of such agency, employment, partnership, conspiracy, ownership and/or joint venture.  Dr. Jespersen is further informed and believes and based thereon alleges that the acts and conduct herein alleged of each such Defendant were known to, authorized by and/or ratified by the other defendants, and each of them.  Each of the individuals named as Defendants is sued here in their official capacity (for injunctive and declaratory relief) and in their individual capacity (for damages) based on actions, inaction, or conduct taken or performed under the color of state law, and was, at all times relevant to this lawsuit, employed by the State of California or CDCR, and was obligated to take all steps necessary to ensure that the respective agency's mission was carried out in accordance with all applicable laws and regulations.

## III.     JURISDICTION AND VENUE

34.     This Court has subject matter jurisdiction over this suit pursuant to 28 U.S.C. Section 1331.

35.     Pursuant to 28 U.S.C. Section 1367, this Court has supplemental jurisdiction over state law claims which "are so related . . . that they form part of the same case or controversy."

36.     Venue is proper in this District pursuant to 42 U.S.C. Section 2000e-5(f) and 28 U.S.C. Section 1391(b).  CDCR is headquartered in Sacramento, California, which is in this District.  CDCR is also Dr. Jespersen's employer.  The unlawful employment practices occurred in the State of California and a substantial part of the events giving rise to the claims occurred in this District.

37.    This lawsuit should be assigned to the Sacramento Division of this Court because a substantial part of the events or omissions giving rise to Dr. Jespersen's claims occurred within Solano County and Sacramento County.

38.    Dr. Jespersen duly filed a Complaint of Employment Discrimination before the California Department of Fair Employment and Housing ("DFEH") and the U.S. Equal Employment Opportunity Commission ("EEOC") on May 27, 2015.  On October 1, 2015, Dr. Jespersen attended a failed mediation facilitated by the DFEH.

39.    On August 15, 2016, Dr. Jespersen amended her DFEH complaint and received a Notice of Case Closure and Right to Sue.

40.    On or about December 1, 2016, Dr. Jespersen filed an (amended) Charge of Discrimination before the U.S. Equal Employment Opportunity Commission ("EEOC"). On April 21, 2017, Dr. Jespersen attended a failed mediation facilitated by the EEOC.

41.    On August 14, 2017, Dr. Jespersen requested a notice of right to sue from the EEOC and is informed and believes it will be received in the immediate future.[1]

## IV.    FACTUAL ALLEGATIONS

42.    In March 2008, Dr. Jespersen began her employment with CDCR as a Clinical Psychologist/Clinical Case Manager at the California State Prison in Sacramento, California.  In February 2009, Dr. Jespersen transferred to the California Medical Facility, a CDCR facility in Vacaville, California.  Since this transition, Dr. Jespersen has continued to serve as a Clinical Psychologist/Clinical Case Manager at the California Medical Facility.

43.    Prior to joining CDCR, Dr. Jespersen received her Bachelor of Arts, *Phi Eta Sigma*, in Legal Studies and Philosophy from the University of California, Santa Cruz and her Masters and Doctorate in Clinical Psychology from the American School of Professional Psychology, graduating at the top of her class.

---

[1] Dr. Jespersen also timely filed a whistleblower retaliation complaint before the California State Personnel Board on June 28, 2017 pursuant to California Government Code Section 8547, *et seq*.

44.     At CDCR, Dr. Jespersen dedicated herself to her job and distinguished herself as a top performer providing quality and humane mental health services to her prisoner patients.  Throughout her employment at CDCR, Dr. Jespersen has consistently received performance ratings of either "above average" or "exceeds expectations."  Dr. Jespersen also served as a Supervising Psychologist for Anka Behavioral Health's CASA Rohnert Park facility from 2010 to 2013.

45.     In addition to being a practicing psychologist, Dr. Jespersen has also taught and published in her field.  Dr. Jespersen served as an adjunct faculty member at The Wright Institute in 2009.  In 2010, Dr. Jespersen published a book on current psychological research regarding the benefits of wellness titled *From This Day On*.

46.     Dr. Jespersen identifies as gender non-conforming, genderqueer, and lesbian.  She is married to another woman.  Dr. Jespersen has short hair and tends to wear masculine clothing, and overall does not conform to feminine stereotypes of appearance or behavior.

47.     As detailed herein, despite Dr. Jespersen's performance, CDCR has discriminated and retaliated against her because of her gender, sexual orientation, association with the LGBTQ community, and complaints of discrimination and harassment against gender non-conforming and LGBTQ prisoners.

**A.     CDCR Fosters an Environment That is Hostile Towards the LGBTQ Community**

48.     Lesbian, gay and bisexual incarcerated people experience sexual abuse by staff at twice the rate of other incarcerated people, and sexual abuse by another incarcerated person at 10 times the rate of other groups.[2]

49.     Transgender prisoners are raped and subjected to coercive sex at alarmingly high rates as well.  A full fifty-nine percent of transgender prisoners in California

---

[2] Allen J. Beck et al., Bureau of Justice Statistics, Sexual Victimization in Prisons and Jails Reported by Inmates, 2011–12 (2013), *available at* http://www.bjs.gov/content/pub/pdf/svpjri1112.pdf.  Transgender women housed in men's prisons are most at risk, reporting sexual assault at 13 times the rate of male inmates.

reported being sexually assaulted while in custody, compared to 4.4% of non-transgender prisoners.[3]

50.    Transgender people are subjected to "rape and sexual exploitation," which are "overlooked or even encouraged by guards, who provide access and impunity as a means of controlling social hierarchies and maintaining order."[4]

51.    In addition to sexual violence, transgender prisoners are often subjected to verbal and physical abuse at the hands of officers or other incarcerated people.  In a 2011 study performed by the National Center for Transgender Equality and the National Gay & Lesbian Taskforce, 18% of transgender women who had experienced incarceration reported physical assault while 9% experienced physical assault by guards.  In the same study, 40% of transgender women respondents reported harassment from other incarcerated people.[5]    Thirty-eight percent reported being harassed by correctional officers or staff.[6]

52.    Based on the above research, in 2012, the Federal Department of Justice ("DOJ") issued mandatory standards ("PREA Standards") to address prisoner rape and assault for vulnerable populations.

53.    The DOJ identified LGBTQ prisoners as a highly vulnerable population and adopted specific standards for the treatment and prevention of rape and sexual assault

---

[3] Valerie Jenness, *Transgender Inmates in California's Prisons: An Empirical Study of a Vulnerable Population* 14 (2009), *available at* http://ucicorrections.seweb.uci.edu/files/2013/06/Transgender-Inmates-in-CAs-Prisons-An-Empirical-Study-of-a-Vulnerable-Population.pdf.

[4] Julia C. Oparah, *Feminism and the (Trans)gender Entrapment of Gender Nonconforming Prisoners*, 18 UCLA Women's L.J. 239, 262 (2012), *available at* http://escholarship.org/uc/item/3sp664r9#page-1 ("Alexis Giraldo, a transgender woman, experienced 'horrific sexual abuse' at the hands of her cellmates in Folsom State Prison.  At the request of a prisoner employed as a lieutenant's clerk, she was assigned as his cellmate.  He immediately began to harass, rape, and threaten her on a daily basis.  Despite asking to be moved to another cell, she was kept in the same cell.  Another prisoner, a friend of her rapist, was also moved to the cell at his request. This second cellmate also began to rape her daily.").

[5] Jaime M. Grant et al, National Center for Transgender Equality & National Gay and Lesbian Task Force, *Injustice at Every Turn: A Report of the National Transgender Discrimination Survey* 166 (2011), *available at* http://www.thetaskforce.org/downloads/reports/ reports/ntds_full.pdf.

[6] *Id.*

against LGBTQ prisoners were included in the mandatory standards.

54.   In 2014, California Governor Jerry Brown submitted an assurance to the DOJ that CDCR would continue its work on developing and implementing policy to ensure compliance with national standards.  CDCR has yet to propose PREA-compliant amendments to Title 15 of the California Code of Regulations and CDCR's Department Operations Manual ("DOM") to adequately protect LGBTQ incarcerated people.

55.   On information and belief, in June 2015, CDCR began training its medical and mental health staff on the new requirements of PREA, specifically some of the requirements related to LGBTQ prisoners.

56.   Despite the new requirements under the PREA Standards, CDCR employees still frequently make homophobic and transphobic comments expressing their hatred for members of the LGBTQ community, which includes CDCR employees like Dr. Jespersen.

57.   For example, on or about July 21, 2014, CDCR employees Jessica Spencer, Chris Biagi, and Anthony Ornelas posted messages on Facebook that "outed" a transgender patient, whom Dr. Jespersen was treating, using the patient's name, her status and location as a mental health patient and other identifying and private information. They referred to the patient using derogatory terms such as "he/she" and "that thing," and stated, "[h]e [*sic*] would probably lick your ass if u wanted."

58.   On May 26, 2016, Officers Tia McDaniels and Lamont Jones made hateful, transphobic statements including, "Transgenders attract flies—you don't want 'em on your unit."

59.   On that same day, Dr. Jespersen spoke with Defendant Gerbasi and expressed concerns for her safety and Defendant Gerbasi informed her that Defendant Hopper had not gotten to Dr. Jespersen prior reports regarding her safety and that Hopper said for Dr. Jespersen not to get paranoid while walking in the parking lot, which is known to be a vulnerable area of the prison.

60.   Those officers and other CDCR employees regularly refuse to use gender

appropriate pronouns, instead insisting on referring to transgender prisoners by their birth-assigned sex.  Efforts to remedy such misgendering fuels further discrimination and harassment.

61.    For instance, upon information and belief, during a training on May 5, 2015, several CDCR employees sighed and rolled their eyes when told to use neutral or respectful pronouns to refer to transgender prisoners.  The officer leading the training replied with words to the effect of, "I know, I know, but you want to get paid, don't you?"

62.    On another occasion, on information and belief, CDCR employees working in the Custody Department pointedly used the pronoun "he" to refer to a transgender woman in response to a social worker who had told them on or around July 1, 2015 that they should be calling transgender women "she."  According to these CDCR employees, the social worker's point was "irrelevant."  A complaint was made, and Warden Robert Fox, California Medical Facility, was notified, but the deliberate misgendering of the transgender prisoner continued.

63.    On or about August 21, 2016, Dr. Jespersen had a meeting in the Warden's office with the Warden and some other high level administrative officials regarding the arrival of a new transgender patient.  In that meeting, custody staff referred to the person in custody as "shim."  Dr. Jespersen spoke out against the use of this derogatory term toward a member of her community.

64.    CDCR employees have forced female transgender prisoners to show their breasts and buttocks to receive their undergarments.  When Dr. Jespersen reported this harassment on August 7, 2015, Correctional Counselor Yuvette Glee, one of the employees harassing transgender prisoners, responded to Dr. Jespersen: "from what I can tell, he ain't got enough tits to show" and "after what he did, he don't get to be a woman."

65.    Upon information and belief, CDCR employees have assisted prisoners in beating and otherwise abusing gay prisoners on the basis of their sexual orientation and

perceived gender nonconformity.

66.   Upon information and belief, transgender prisoners have been denied privacy screens without legitimate reason, while being unnecessarily forced to strip down to receive their undergarments.

67.   Guards impede gay, transgender, and gender non-conforming prisoners from accessing mental health treatment.   On one occasion, on June 16, 2016, Officer McDaniels prevented prisoners from attending a support group because they were transgender.   These women were also women of color.   On another occasion, on November 30, 2015, the CDCR identification cards belonging to a group of transgender prisoners were stolen and thrown down an elevator shaft while the patients were attending a transgender support group put on by CDCR mental health staff.

**B.   Dr. Jespersen Protested CDCR's Discrimination and Harassment Against the LGBTQ Community**

68.   Dr. Jespersen has made dozens of complaints – including several explicit, written, and verbal complaints – about the ongoing hostility towards gay and transgender prisoners and the harassment and hostile work environment she has experienced on various administrative levels at CDCR because of her gender—including her sex, sexual orientation, and gender expression—and because of her advocacy on behalf the LGBTQ and gender nonconforming prison population.

69.   Despite responding promptly to complaints concerning other types of issues, CDCR has failed to correct the conditions Dr. Jespersen identified in these complaints and has discouraged her from making them.

70.   Dr. Jespersen's complaints include, but are not limited to:

a.   On or about July 21, 2014, Dr. Jespersen complained about Jessica Spencer, Chris Biagi, and Anthony Ornelas's discriminatory and hostile social media posts to her Unit Supervisor.   Upon information and belief, a written report was provided to CDCR leadership members, including CEO Jackie Clark, Chief of Mental Health David Silbaugh, Chief of Psychiatry Joan Gerbasi, Investigative Services Unit Lieutenant

Anthony Lee, and Associate Warden Dan Cueva.  On December 19, 2014, Dr. Jespersen was informed of CDCR's decision to dismiss the complaint as a rumor.  On December 22, 2014, Dr. Jespersen learned from the Investigative Services Unit that no one was interviewed despite the witness list and contact information provided with the complaint.  According to the DFEH, CDCR disclosed to the DFEH that it did not discipline any employees in relation to Ms. Spencer, Mr. Biagi, and Mr. Ornelas's social media post, claiming that CDCR had no responsibility to do so because the incident took place outside of the workplace.  However, the Department Operations Manual (DOM) specifies that the sexual harassment policy "applies to conduct that occurs off duty and is brought back to the workplace, when such conduct adversely affects the individual in a manner otherwise prohibited by this policy."[7]

   b.   On December 30, 2014, Dr. Jespersen reported experiencing sexual harassment based on her status as a gender non-conforming lesbian woman and a member of the LGBTQ community.  Specifically, Dr. Jespersen's complaint reported the hostile work environment created by Jessica Spencer, Chris Biagi, and Anthony Ornelas's social media post and CDCR's callous apathy in responding to it.   Dr. Jespersen made this complaint to the Custody Department and Associate Warden Steve Pryor.  No one interviewed her and no one generated a written complaint, in violation of CDCR policy.

   c.   On or around May 29, 2015, Dr. Jespersen reported to Dr. Joan Gerbasi that Dr. Debbie McKinney, a CDCR employee, had disclosed Dr. Jespersen's sexual orientation without her consent by informing other employees about her relationship with a woman.  Following this disclosure, Dr. Jespersen was transferred from the Crisis Bed Unit to a Correctional Clinical Case Management System ("CCCMS") unit on the mainline of the main prison facility, where Officer McDaniels was stationed.

---

[7] Upon information and belief, one of the Lieutenants involved in the Facebook incident was promoted to Captain.

d.     On December 2, 2015, Dr. Jespersen complained to Dr. Gerbasi about a correctional officer forcing a transgender prisoner to strip search to retrieve her property and subsequently denying her a privacy screen.  Dr. Gerbasi escalated the PREA violation to Warden Robert Fox.

e.     On March 8, 2016, Dr. Jespersen submitted a PREA report to the Watch Commander about an incident whereby a gay prisoner of color ("Prisoner 1") had been assaulted and battered by another prisoner ("Prisoner 2"), who had been assaulting LGBTQ prisoners.   Dr. Jespersen performed a psychological evaluation and risk assessment on the prisoner who had been assaulted.  Prisoner 2 was provided access to Prisoner 1 and provided the opportunity to assault and batter him when a CDCR employee left the shower door open while Prisoner 1 was showering.   As CDCR employees typically lock these shower doors, the CDCR employee(s)'s decision to not lock the shower door constituted assistance in the physical assault of a man based on his sexual orientation.

f.     The Watch Commander refused to accept Dr. Jespersen's March 2016 PREA report, instructing Dr. Jespersen to direct the report to the L-2 Unit Lieutenant, which does not exist.  Dr. Jespersen then brought her report to the J-2 Unit Lieutenant who assured her that he would alert the Investigative Services Unit ("ISU") about the incident.   When Dr. Jespersen followed up with ISU, they told her they had never received the report.  In light of this, Dr. Jespersen submitted an additional complaint about the CDCR's leadership's efforts to block her complaint of discrimination and harassment, as well as CDCR's failure to take action.   Upon information and belief, CDCR has taken no action to remedy the beating incident, nor did it respond to Dr. Jespersen's concerns about CDCR's complaint management.

g.     On March 16, 2016, Dr. Jespersen submitted a PREA report to the Watch Commander that a transgender prisoner was told she could not file a complaint about a CDCR officer who had been deliberately and with the intention of belittling her using male pronouns to refer to her, even after she asked him to stop.  Dr. Jespersen was

following the reporting protocol and guidelines related to staff sexual harassment on which she was trained in June 2015.  To Dr. Jespersen's knowledge, CDCR took no action.

h.    On May 26, 2016, Dr. Jespersen reported the May 26, 2016 comment of, "Transgenders attract flies—you don't want 'em on your unit" to Supervisor Joe Dintino.  Dr. Jespersen also reported the comment to EEO Coordinator Brian Olson on June 8, 2016.  Still, based on information and belief, no one took any action.

## C.    CDCR Discriminated and Retaliated Against Dr. Jespersen Due to Her Gender and Sexual Orientation, Association with and Advocacy on Behalf of the LGBTQ Community, and for Complaining About Unlawful Harassment

71.    In response to the countless complaints Dr. Jespersen raised on behalf of herself and other members of the LGBTQ community at CDCR, and because of Dr. Jespersen's gender, gender expression, sexual orientation, and her association with and advocacy on behalf of gender nonconforming, gay, and transgender prisoners, CDCR subjected Dr. Jespersen to escalating discrimination, harassment, and retaliation.

72.    As part of this retaliatory campaign, CDCR enabled Officer McDaniels – a frequent discriminator and harasser of gender nonconforming, gay, and transgender prisoners, who Dr. Jespersen reported on several occasions, to target Dr. Jespersen.

73.    Specifically, Officer McDaniels began soliciting prisoners to attack Dr. Jespersen.  Such incidents include, but are not limited to:

a.    On December 14, 2015 – two weeks after Dr. Jespersen reported a correctional officer's refusal to provide a privacy screening to a transgender prisoner – Officer McDaniels endangered Dr. Jespersen's life by locking her in the unit with a prisoner who is serving multiple life sentences for rape, unsupervised, alone, and without access to a safety alarm.  The next day, Dr. Jespersen reported Officer McDaniels's actions to Supervisor Joseph Dintino and the Watch Commander on duty.

b.    On March 17, 2016 – the day after one of Dr. Jespersen's complaints on behalf of a transgender prisoner – Officer McDaniels again locked Dr. Jespersen in the

unit with no supervision from custody and no safety alarms – this time with two prisoners.  Dr. Jespersen again reported Officer McDaniels's actions to Supervisor Joseph Dintino.

c.      On or around April 7, 2016, as Dr. Jespersen walked by Officer McDaniels, Officer McDaniels commented to a group of prisoners regarding her, "fat ass—I hate that motherfucking bitch."  In prison, such a statement is intended, and is readily interpreted, as a solicitation of violence.  Dr. Jespersen reported the incident to the Watch Commander.

d.      On or around April 28, 2016, Officer McDaniels said of Dr. Jespersen to a group of prisoners, "she is rent to own. . . she's gotta stop putting my name out there.  That's rent to own."  "Rent to own" is a phrase used to incite violence and imply female promiscuity.  Dr. Jespersen reported this incident to Supervisor Joseph Dintino and consulted with her Union Representative, Dr. Victor Pacheco.

74.    These solicitations of violence were particularly frightening and legitimate due to Officer McDaniels's relationship with the prisoners.  Officer McDaniels has the discretion to punish and reward prisoners, including by expanding or restricting their privileges; therefore, Officer McDaniels's solicitation of harm towards Dr. Jespersen put her in significant danger, given the incentives for prisoners to follow through with a request from a custody officer.

75.    The threats to Dr. Jespersen's safety continued.  Specifically, on May 24, 2017, Dr. Jespersen overheard Officer McDaniels solicit physical harm against Dr. Jespersen by stating to a group of prisoners, "She needs to be reminded where she's at."  Later in the day, Dr. Jespersen overheard Officer McDaniels state to a prisoner, "It's Jespersen - no listen [whisper] it's Jespersen telling people it's unsafe."  Dr. Jespersen reported the incident to Supervisor Joe Dintino, the Watch Commander.  The incident was escalated to then CEO Joan Gerbasi and Warden Robert Fox.

76.    On May 31, 2016, Dr. Jespersen consulted her Union Representative, Dr. Victor Pacheco regarding her safety concerns.  Dr. Pacheco confirmed that her name

being given to prisoners, while suggesting she be "reminded where she's at" creates a significant safety risk.

77.     After each of these solicitations of violence, Dr. Jespersen submitted complaints to Officer McDaniels's Supervisor and Watch Commander.  Nothing was done to remedy the concerns Dr. Jespersen raised.  For months following Dr. Jespersen's initial complaints on this harassment, CDCR did not follow up.  Rather, CDCR knowingly allowed Officer McDaniels to escalate her retaliatory harassment.  Upon information and belief, CDCR permitted Officer McDaniels to continue endangering Dr. Jespersen's life because of her complaints, her gender, her sexual orientation, and her association with gender nonconforming, gay, and transgender prisoners.

78.     On June 8, 2016, Dr. Jespersen complained to EEO Coordinator Brian Olson about Officer McDaniels.  Dr. Jespersen specified that she felt that Officer McDaniels was retaliating and discriminating against her based on her gender, her sexual orientation, and for engaging in protected activities.  Despite her repeated complaints, Officer McDaniels continued her unabashed discrimination, harassment, and retaliation.  On one occasion, Dr. Jespersen overheard Officer McDaniels exclaim loudly, "I am the motherfucking police, I can't folks on the outside too."

79.     Upon information and belief, on or about June 16, 2016, Officer McDaniels prevented prisoners from attending a LGBTQ support group.  The leader of this group heard Officer McDaniels shout, "You're no woman, you have a dick, your breasts can't give milk and you will never have a man" and "I don't agree with your lifestyle and I never will, and this is a men's prison, you are not 'she.'"  Then Officer McDaniels approached the support group leader and threatened words to the effect of, "Are you intending to write me up? Because we need to have each other's backs up in here. . ."  A complaint was filed by the group leader.

### D.     CDCR Interfered with Dr. Jespersen's Protected Medical Leave and Demoted Her

80.     After Dr. Jespersen filed her (amended) EEOC Charge of Discrimination on

December 1, 2016, upon information and belief, CDCR made no effort to remedy previous discrimination or improve her working conditions to prevent future discrimination, retaliation, harassment or danger to her physical safety.

81.     Because CDCR refused end the harassment, to discipline Officer McDaniels or to address Dr. Jespersen's safety concerns, Dr. Jespersen was and had been experiencing emotional, mental and physical distress.  Her doctor put her on a medical leave of absence.  Dr. Jespersen provided a standard medical notice from her doctor to CDCR and a return to work coordinator.  Dr. Jespersen started her medical leave on June 1, 2016.

82.     In late June, Dr. Joan Gerbasi contacted Dr. Jespersen to pressure her to return early from her medical leave.  Dr. Jespersen felt compelled to oblige.  Dr. Gerbasi indicated she would be stationed on a different unit off the mainline until they completed the investigation into her complaints regarding Officer McDaniels.

83.     On June 28, 2016, Dr. Jespersen returned to the California Medical Facility.  Following Dr. Jespersen's return from medical leave, rather than addressing Officer McDaniels's unlawful activities, CDCR furthered its ongoing retaliation by removing Dr. Jespersen's from direct patient care, as well as her oversight responsibilities for patient care.  Dr. Jespersen's new job duties are largely secretarial and administrative in nature, involving tasks such as answering emails and phone calls.  These conditions adversely affected the material terms of Dr. Jespersen's job duties.  This decision to demote Dr. Jespersen was presented as a temporary solution for Officer McDaniels's harassment while her complaints were being investigated and addressed.

84.     Dr. Jespersen's demoted role requires her to perform tasks by individuals with far less academic qualifications and experience.  She is the only position in the clinical workforce, not including Specialist and Supervisors who are above her, that has no patient contact at all.  She is not able to facilitate mental health groups or provide individual therapy or conduct assessments.  To-date, Dr. Jespersen remains in this workstation and job position and remains in fear for her safety. Dr. Jespersen has

complained about her demoted role on several occasions.  CDCR has not made any effort to return her to her original position without having to endure the threat of danger to her safety from Officer McDaniels and prisoners whom Officer McDaniels incited to commit violence against her.

85.    On July 6, 2016, Dr. Jespersen filed a report about Officer McDaniels's behavior with Dr. Gerbasi.  The report stated that Officer McDaniels has identified herself as homophobic and transphobic and has been targeting Dr. Jespersen for months because of her gender, sexual orientation, and identification with the LGBTQ community.

86.    Less than a week after Dr. Jespersen's July 6, 2016 report, CDCR granted Officer McDaniels's request for placement at Dr. Jespersen's new work location off the mainline of the prison.  Upon information and belief, Officer McDaniels had never worked in this area before.  Dr. Jespersen complained to CDCR about the dangerous and hostile work environment this perpetuates.  However, Officer McDaniels continued to work at Dr. Jespersen's new location until February 2017.

87.    In approximately February 2017, Officer McDaniels was assigned to a unit that is considered the hub of mental health treatment, where most mental health care treatment team meetings for CDCR patients at the California Medical Facility take place.  Upon information and belief Officer McDaniels sought this placement to intimidate Dr. Jespersen and prevent her from returning to her original position.  Officer McDaniels remains assigned to this unit and in direct contact with many of CMF's mental health patients.  Dr. Jespersen's temporary removal from direct patient care and oversight of patient care has become CDCR's permanent "solution" to Officer McDaniels's harassment.

### E.    CDCR Retaliated Against Dr. Jespersen For Whistleblowing about HIPAA and PREA Violations

88.    In addition to protesting discrimination and harassment, Dr. Jespersen blew the whistle on CDCR's violations of the Health Insurance Portability and Accountability

Act ("HIPAA") and 28 CFR Part 115, National Standards to Prevent, Detect and Respond to Prison Rape Final Rule ("PREA"), as detailed below.

### i. *Dr. Jespersen Protested CDCR's Violation of a Transgender Prisoner's HIPAA Rights*

89.   When Dr. Jespersen reported Jessica Spencer, Chris Biagi, and Anthony Ornelas's social media post on or around July 21, 2014, Dr. Jespersen also informed CDCR that the post breached HIPAA laws by identifying a prisoner's name, diagnosis, and placement in a unit run by the Department of State Hospitals.  As detailed above, after the complaint was submitted to various members of CDCR's leadership, CDCR decided to take no action because the event occurred outside of the workplace.

90.   On or around December 23, 2014, the Department of Health and Human Services instructed Dr. Jespersen to disclose the social media post to her patient pursuant to HIPAA.  In or around March 2015, Chief of Psychiatry Joan Gerbasi prohibited Dr. Jespersen from doing so, claiming that CDCR remained undecided if a HIPAA violation had occurred.  On or around May 6, 2017, Dr. Jespersen again expressed concern to Dr. Gerbasi about CDCR's failure to inform her patient about its employees' breach of HIPAA.  When Dr. Jespersen stated that she felt obligated to inform CDCR's headquarters, Dr. Gerbasi instructed her not to, explaining that it should be reported by Dr. Silbaugh.  On September 9, 2015, CDCR informed Dr. Jespersen that its investigation concluded that Jessica Spencer, Chris Biagi, and Anthony Ornelas's social media post did constitute a HIPAA security breach.

91.   On May 27, 2015, Dr. Jespersen filed an Information Security Incident Report to California Correctional Health Care Services ("CCHCS") regarding the HIPAA violation.

### ii. *Dr. Jespersen Protested CDCR's PREA Violations*

92.   As detailed above in Sections IV.B and IV.C, Dr. Jespersen has reported dozens of PREA violations and has filed several PREA reports about CDCR's discrimination and harassment.

---

**F.    CDCR Has Damaged Dr. Jespersen's Physical, Mental, and Emotional Well-Being**

93.    Prior to the first incident involving the HIPAA breach and subsequent retaliation, Dr. Jespersen was happy with her job.  Now, she lives in constant fear of violence and harassment at work and at home.

94.    As a result of the discrimination and harassment, Dr. Jespersen has experienced emotional and physical distress.  She has developed numerous symptoms related to anxiety, depression and trauma. She has become hypervigilant, concerned someone will be able to trace her car at work and will find out where she lives.  Most nights, she does not sleep more than 3 hours as she often lays awake ruminating about work and wakes up from nightmares and anxiety.  Her relationships outside of work have also suffered as she has difficulty being present and often dissociates with friends and family. She feels hopeless, powerless and has lost confidence. On a daily basis, Dr. Jespersen passion for life and her profession has dissipated as she sits in a desk job unable to see patients or provide mental health care that she is licensed and trained to provide.

95.    She is also experiencing physical repercussions that her physician suspects are due to the psychological distress she is experiencing because of the harassment and discrimination in her employment. She was recently diagnosed with Temporomandibular Joint Disorder (TMJ) due to muscle tension in her neck and jaw, and teeth grinding. She is scheduled for a sleep study because her physician suspects she has developed sleep apnea. Dr. Jespersen had never experienced these symptoms prior to being targeted and constructively demoted. Dr. Jespersen is seeking to right the many wrongs inflicted upon her by CDCR.

96.    Dr. Jespersen lives in constant fear of violence and harassment at work and at home.  As a result of the discrimination and harassment, she has experienced emotional and physical distress including, but not limited to, anxiety, depression, sleep disturbance, weight gain, and teeth grinding.  On a daily basis, Dr. Jespersen passion for life and

profession has dissipated as she sits in a desk job unable to see patients or provide mental health care that she is licensed and trained to provide.  Dr. Jespersen is seeking to right the many wrongs inflicted upon her by CDCR.

## V.   COUNTS

### COUNT I
**Violation of Title VII, Hostile Work Environment**
**42 U.S.C. § 2000e, *et seq.***
**(Against CDCR)**

97.   Dr. Jespersen re-alleges and incorporates each and every allegation contained in this Complaint.

98.   Throughout Dr. Jespersen's employment, CDCR employees and prisoners subjected her to unwelcome comments, conduct, and actions that were severe or pervasive because of her gender, including her nonconformity with gender stereotypes, and because of her advocacy on behalf of and association with gender nonconforming prisoners, in violation of Title VII.  Such comments, conduct and actions include, but are not limited to constant name calling, endangering her safety, and threats of violence.  A reasonable employee in Dr. Jespersen's circumstances would have considered the work environment to be hostile or abusive, and Dr. Jespersen perceived her work environment to be hostile and abusive.

99.   The hostile work environment at CDCR altered the terms and conditions of Dr. Jespersen's employment and had the purpose or effect of unreasonably interfering with her ability to perform her work duties.

100.   CDCR and members of its management knew or should have known of the harassment and failed to take prompt, effective remedial action reasonably calculated to end the harassment.

101.   CDCR's conduct has been intentional, deliberate, willful, malicious, reckless, and conducted in callous disregard of Dr. Jespersen's rights.  The hostile work environment was created, approved, and ratified by officers and managing agents of

CDCR.

102.   By reason of the continuous nature of CDCR's discriminatory conduct, which persists to date, Dr. Jespersen is entitled to application of the continuing violations doctrine to all violations alleged herein.

103.   CDCR's actions and failures to act have caused Dr. Jespersen to suffer harm, including without limitation lost earnings, lost benefits, lost future employment opportunities, and other financial losses, as well as humiliation, embarrassment, emotional and physical distress, and mental anguish.

104.   Because of CDCR's conduct, Dr. Jespersen is entitled to all legal and equitable remedies available for violations of Title VII.

## COUNT II
### Violation of Title VII, Retaliation
### 42 U.S.C. § 2000e-3(a), 42 U.S.C. § 2000e-5(f)(3)
### (Against CDCR)

105.   Dr. Jespersen re-alleges and incorporates each and every allegation contained in this Complaint.

106.   Dr. Jespersen engaged in protected activity under Title VII that included, but is not limited to, complaining internally and externally about the discrimination and harassment she experienced at CDCR because of her gender, including her nonconformity with gender stereotypes, and because of her advocacy on behalf of and association with gender nonconforming prisoners.

107.   As detailed above, Dr. Jespersen complained directly to Associate Warden Steve Pryor, Chief of Mental Health David Silbaugh, Chief of Psychiatry Joan Gerbasi, Supervisor Joe Dintino, EEO Coordinator Brian Olson, and several Watch Commanders. She also complained through administrative complaints.

108.   CDCR retaliated against Dr. Jespersen for complaining about harassment and discrimination.  CDCR's retaliatory acts include, but are not limited to, isolating Dr. Jespersen and constructively demoting her to an administrative role where she can no

longer treat patients and is no longer in a position to observe the treatment of gay, transgender, and gender nonconforming prisoners.  These adverse employment actions materially and adversely changed Dr. Jespersen's overall terms and conditions of employment.

109.  A reasonable employee would find CDCR's retaliatory acts materially adverse and such acts would dissuade a reasonable person from making or supporting a charge of discrimination.

110.  CDCR's retaliatory acts against Dr. Jespersen were a direct and proximate result of her protected activities.

111.  CDCR's conduct has been intentional, deliberate, willful, malicious, reckless, and conducted in callous disregard of Dr. Jespersen's rights.

112.  By reason of the continuous nature of CDCR's discriminatory and retaliatory conduct, which persists to date, Dr. Jespersen is entitled to application of the continuing violations doctrine to all violations alleged herein.

113.  CDCR's actions and failures to act have caused Dr. Jespersen to suffer harm, including without limitation lost earnings, lost benefits, lost future employment opportunities, and other financial losses, as well as humiliation, embarrassment, emotional and physical distress, and mental anguish.

114.  Because of CDCR's conduct, Dr. Jespersen is entitled to all legal and equitable remedies available for violations of Title VII.

## COUNT III
### Violation of the FMLA, Interference
### Family and Medical Leave Act, 29 U.S.C. § 2601, *et seq.*
### (Against CDCR)

115.  Dr. Jespersen re-alleges and incorporates each and every allegation contained in this Complaint.

116.  Under the FMLA, an employee must be restored by the employer to the same position held by the employee when the leave commenced, or to an equivalent

position with equivalent employment benefits, pay, and other terms and conditions of employment.

117. Dr. Jespersen was eligible for FMLA leave because she had a serious health condition. She provided appropriate notice of her need to take protected leave to CDCR and took protected leave.

118. CDCR interfered with her medical leave by pressuring Dr. Jespersen to return to work prematurely.

119. CDCR further interfered with her medical leave by refusing to return Dr. Jespersen to the same or an equivalent position. To the contrary, CDCR constructively demoted and isolated Dr. Jespersen to an administrative role where she can no longer treat patients. Dr. Jespersen's taking of protected leave was a factor in CDCR's decision to demote Dr. Jespersen.

120. CDCR's conduct has been intentional, deliberate, and willful.

121. By reason of the continuous nature of CDCR's discriminatory and retaliatory conduct, which persists to date, Dr. Jespersen is entitled to application of the continuing violations doctrine to all violations alleged herein.

122. CDCR's actions and failures to act have caused Dr. Jespersen to suffer harm, including without limitation lost earnings, lost benefits, lost future employment opportunities, and other financial losses, as well as humiliation, embarrassment, emotional and physical distress, and mental anguish.

123. Because of CDCR's conduct, Dr. Jespersen is entitled to all legal and equitable remedies available for violations of the FMLA.

## COUNT IV
### Violation of the Equal Protection Clause
### Fourteenth Amendment to the U.S. Constitution
### 42 U.S.C. § 1983, *et seq*.
### (Against CDCR, Defendants Kernan, Fox, Pryor, Cueva, Gerbasi, Clark, Lee, Hopper, Huntley, and McDaniels, and Does 1-50)

124. Dr. Jespersen re-alleges and incorporates each and every allegation

contained in this Complaint.

125.   Under the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution, discrimination based on sex—including gender, sexual orientation, gender identity, transgender status, and nonconformity to sex- or gender-based stereotypes—as well as discrimination based on sexual orientation or transgender status alone, is presumptively unconstitutional and is therefore subject to heightened scrutiny.

126.   The discriminatory, harassing, and retaliatory actions taken by CDCR and Defendants Kernan, Fox, Pryor, Cueva, Gerbasi, Clark, Huntley, and McDaniels, and Does 1-50 against Dr. Jespersen were because of her gender, sexual orientation, and gender nonconformity, and because of the gender, sexual orientation, gender nonconformity, and transgender status of the persons associated with Dr. Jespersen, namely, the gay, transgender, and gender nonconforming prisoners whom Dr. Jespersen attempted to protect from abuse.

127.   CDCR and Defendants Kernan, Fox, Pryor, Cueva, Gerbasi, Clark, Huntley, and McDaniels, and Does 1-50 intentionally treated Dr. Jespersen differently from others to whom she was similarly situated, and this discriminatory treatment did not further any important or even rational government interest.

128.   CDCR and Defendants Kernan, Fox, Pryor, Cueva, Gerbasi, Clark, Huntley, and McDaniels, and Does 1-50 therefore deprived Dr. Jespersen of her right to the equal protection of the laws.

129.   By reason of the continuous nature of the discriminatory and retaliatory conduct of CDCR and Defendants Kernan, Fox, Pryor, Cueva, Gerbasi, Clark, Huntley, and McDaniels, and Does 1-50, which persists to date, Dr. Jespersen is entitled to application of the continuing violations doctrine to all violations alleged herein.

130.   The actions and failures to act of CDCR and Defendants Kernan, Fox, Pryor, Cueva, Gerbasi, Clark, Huntley, and McDaniels, and Does 1-50 have caused Dr. Jespersen to suffer harm, including without limitation lost earnings, lost benefits, lost

future employment opportunities, and other financial losses, as well as humiliation, embarrassment, emotional and physical distress, and mental anguish.

131.    Because of the conduct of CDCR and Defendants Kernan, Fox, Pryor, Cueva, Gerbasi, Clark, Huntley, and McDaniels, and Does 1-50, Dr. Jespersen is entitled to all legal and equitable remedies available for violations of the Fourteenth Amendment to the U.S. Constitution.

<u>COUNT V</u>
**Violation of the First Amendment to the U.S. Constitution**
**42 U.S.C. § 1983**
**(Against CDCR, Defendants Kernan, Fox, Dintino, Hopper, and Does 1-50)**

132.    Dr. Jespersen re-alleges and incorporates each and every allegation contained in this Complaint.

133.    The First Amendment to the United States Constitution protects an individual's right to free speech.

134.    The discriminatory, harassing, and retaliatory actions taken by CDCR, Defendants Kernan, Fox, Dintino, and Does 1-50 against Dr. Jespersen were because of her advocacy, complaints, and speech about matters of public concern: namely, the mistreatment of gay, transgender, and gender nonconforming prisoners and staff by CDCR.

135.    Additionally, CDCR and custody staff (Defendant Dintino, an unknown Doe Watch Commander who was working on March 8, 2016, and an unknown Doe J-2 Unit Lieutenant who was working on March 8, 2016) prevented Dr. Jespersen from exercising her free speech rights by refusing to accept her PREA reports.

136.    CDCR's discriminatory, harassing, and retaliatory actions did not further any important or even rational government interest.

137.    CDCR therefore deprived Dr. Jespersen of her right to free speech under the First Amendment to the United States Constitution.

138.    By reason of the continuous nature of CDCR's discriminatory and retaliatory conduct, which persists to date, Dr. Jespersen is entitled to application of the

1  continuing violations doctrine to all violations alleged herein.

2      139.   CDCR's actions and failures to act have caused Dr. Jespersen to suffer harm,

3  including without limitation lost earnings, lost benefits, lost future employment

4  opportunities, and other financial losses, as well as humiliation, embarrassment,

5  emotional and physical distress, and mental anguish.

6      140.   Because of CDCR's conduct, Dr. Jespersen is entitled to all legal and

7  equitable remedies available for violations of the First Amendment to the U.S.

8  Constitution.

### COUNT VI
**Violation of FEHA, Hostile Work Environment**
**Cal. Govt. Code Section 12940 *et seq.***
**(Against CDCR)**

12      141.   Dr. Jespersen re-alleges and incorporates each and every allegation

13  contained in this Complaint.

14      142.   Throughout Dr. Jespersen's employment, CDCR employees and prisoners

15  subjected her to unwelcome comments, conduct, and actions that were severe or

16  pervasive because of her gender, including her nonconformity with gender stereotypes,

17  her sexual orientation, and because of her advocacy on behalf of and association with

18  gender nonconforming, gay, and transgender prisoners.  Such comments, conduct and

19  actions include, but are not limited to constant name calling, endangering her safety, and

20  threats of violence.

21      143.   A reasonable employee in Dr. Jespersen's circumstances would have

22  considered the work environment to be hostile or abusive, and Dr. Jespersen perceived

23  her work environment to be hostile and abusive.

24      144.   The hostile work environment at CDCR altered the terms and conditions of

25  Dr. Jespersen's employment and had the purpose or effect of unreasonably interfering

26  with her ability to perform her work duties.

27      145.   CDCR's conduct has been deliberate, willful, oppressive, malicious,

28  fraudulent, and conducted in callous disregard of Dr. Jespersen's rights.  The hostile work

environment was created, approved, and ratified by officers and managing agents of CDCR.

146.   By reason of the continuous nature of CDCR's discriminatory conduct, which persists to date, Dr. Jespersen is entitled to application of the continuing violations doctrine to all violations alleged herein.

147.   CDCR's actions and failures to act have caused Dr. Jespersen to suffer harm, including without limitation lost earnings, lost benefits, lost future employment opportunities, and other financial losses, as well as humiliation, embarrassment, emotional and physical distress, and mental anguish.

148.   Because of CDCR's conduct, Dr. Jespersen is entitled to all legal and equitable remedies available for violations of the FEHA.

## COUNT VII
### Violation of FEHA, Retaliation
### Cal. Govt. Code Section 12940(h)
### (Against CDCR)

149.   Dr. Jespersen re-alleges and incorporates each and every allegation contained in this Complaint.

150.   Dr. Jespersen engaged in protected activity under the FEHA that included, but is not limited to, complaining internally and externally about the discrimination and harassment she experienced at CDCR because of her gender, including her nonconformity with gender stereotypes, her sexual orientation, and because of her advocacy on behalf of and association with gender nonconforming, gay, and transgender prisoners.

151.   As detailed above, Dr. Jespersen complained directly to Associate Warden Steve Pryor, Chief of Mental Health David Silbaugh, Chief of Psychiatry Joan Gerbasi, Supervisor Joe Dintino, EEO Coordinator Brian Olson, and several Watch Commanders. She also complained through administrative complaints.

152.   CDCR retaliated against Dr. Jespersen for complaining about harassment and discrimination.  CDCR's retaliatory acts include, but are not limited to, isolating Dr.

Jespersen and constructively demoting her to an administrative role where she can no longer treat patients.   These adverse employment actions materially and adversely changed Dr. Jespersen's overall terms and conditions of employment.

153.   A reasonable employee would find CDCR's retaliatory acts materially adverse and such acts would dissuade a reasonable person from making or supporting a charge of discrimination.

154.   CDCR's retaliatory acts against Dr. Jespersen were a direct and proximate result of her protected activities.

155.   CDCR's conduct has been deliberate, willful, oppressive, malicious, fraudulent, and conducted in callous disregard of Dr. Jespersen's rights.   The retaliatory adverse employment action decisions were made, approved, and ratified by officers and managing agents of CDCR.

156.   By reason of the continuous nature of CDCR's retaliatory and retaliatory conduct, which persists to date, Dr. Jespersen is entitled to application of the continuing violations doctrine to all violations alleged herein.

157.   CDCR's actions and failures to act have caused Dr. Jespersen to suffer harm, including without limitation lost earnings, lost benefits, lost future employment opportunities, and other financial losses, as well as humiliation, embarrassment, emotional and physical distress, and mental anguish.

158.   Because of CDCR's conduct, Dr. Jespersen is entitled to all legal and equitable remedies available for violations of the FEHA.

**COUNT VIII**
**Violation of CFRA, Interference**
**Cal. Govt. Code Section 12945.1 *et seq.***
**(Against CDCR Viacom and CDCR)**

159.   Dr. Jespersen re-alleges and incorporates each and every allegation contained in this Complaint.

160.   Dr. Jespersen was eligible for medical leave under the CFRA.

161.   Dr. Jespersen requested and took leave for her own serious health condition

1  that made her temporarily unable to perform the functions of her job with CDCR.

2  162.   Dr. Jespersen provided reasonable notice to CDCR of her need for medical

3  leave, including its expected timing and length.

4  163.   CDCR refused to return Dr. Jespersen to the same or a comparable job when

5  her medical leave ended.  Indeed, CDCR pressured Dr. Jespersen to return from medical

6  leave prematurely.

7  164.   Dr. Jespersen's taking of protected leave was a negative factor in CDCR's

8  decision to constructively demote her.

9  165.   As a result of CDCR's conduct alleged in this complaint, Dr. Jespersen has

10 suffered and continues to suffer harm, including but not limited to lost earnings, lost

11 benefits, lost future employment opportunities, other financial loss, as well as

12 humiliation, embarrassment, emotional and physical distress, and mental anguish.

13 166.  CDCR's conduct has been deliberate, willful, oppressive, malicious,

14 fraudulent, and conducted in callous disregard of Dr. Jespersen's rights.  The decision to

15 refuse to return Dr. Jespersen to her position was made, approved, and ratified by officers

16 and managing agents of CDCR.

17 167.   By reason of the continuous nature of CDCR's discriminatory and

18 retaliatory conduct, which persists to date, Dr. Jespersen is entitled to application of the

19 continuing violations doctrine to all violations alleged herein.

20 168.   CDCR's actions and failures to act have caused Dr. Jespersen to suffer harm,

21 including without limitation lost earnings, lost benefits, lost future employment

22 opportunities, and other financial losses, as well as humiliation, embarrassment,

23 emotional and physical distress, and mental anguish.

24 169.   Because of CDCR's conduct, Dr. Jespersen is entitled to all legal and

25 equitable remedies available for violations of the CFRA.

26

**COUNT IX**
**Violation of CRFA, Retaliation**
**California Family Rights Act, Cal. Govt. Code Section 12945.2**
**(Against CDCR)**

27

28

---

COMPLAINT FOR DAMAGES, PENALTIES, AND INJUNCTIVE RELEIF
-34-

170.   Dr. Jespersen re-alleges and incorporates each and every allegation contained in this Complaint.

171.   Dr. Jespersen was eligible for medical leave under the CFRA.

172.   Dr. Jespersen requested and took leave for her own serious health condition that made her temporarily unable to perform the functions of her job with CDCR.

173.   Dr. Jespersen provided reasonable notice to CDCR of her need for medical leave, including its expected timing and length.

174.   CDCR refused to return Dr. Jespersen to the same or a comparable job when her medical leave ended.  Indeed, CDCR pressured Dr. Jespersen to return from medical leave prematurely.

175.   Dr. Jespersen's taking of protected leave was a negative factor in CDCR's decision to constructively demote her.

176.   As a result of CDCR's conduct alleged in this complaint, Dr. Jespersen has suffered and continues to suffer harm, including but not limited to lost earnings, lost benefits, lost future employment opportunities, other financial loss, as well as humiliation, embarrassment, emotional and physical distress, and mental anguish.

177.   CDCR's conduct has been deliberate, willful, oppressive, malicious, fraudulent, and conducted in callous disregard of Dr. Jespersen's rights.  The decision to refuse to return Dr. Jespersen to her position was made, approved, and ratified by officers and managing agents of CDCR.

178.   By reason of the continuous nature of CDCR's discriminatory and retaliatory conduct, which persists to date, Dr. Jespersen is entitled to application of the continuing violations doctrine to all violations alleged herein.

179.   CDCR's actions and failures to act have caused Dr. Jespersen to suffer harm, including without limitation lost earnings, lost benefits, lost future employment opportunities, and other financial losses, as well as humiliation, embarrassment, emotional and physical distress, and mental anguish.

180.   Because of CDCR's conduct, Dr. Jespersen is entitled to all legal and

equitable remedies available for violations of the CFRA.

## COUNT X
### Violation of California's General Whistleblower Statutes, Retaliation
### Labor Code § 1102.5 *et seq.*
### (Against CDCR)

181. Dr. Jespersen incorporates and restates each of the above paragraphs as if fully set forth herein.

182. Pursuant to California's General Whistleblower Statutes, beginning with California Labor Code § 1102.5, it is illegal in the State of California to retaliate against any employee who provides information to a government or law enforcement agency where the employee has reasonable cause to believe that the information discloses a violation or noncompliance with a state or federal statute, rule, or regulation.

183. Pursuant to Labor Code § 1104, CDCR is responsible for the acts of its managers, officers, agents, and employees for violations of Labor Code § 1102.5.

184. Dr. Jespersen reporting activities described in Sections IV.B, IV.C, and IV.E are incorporated herein by reference.

185. Plaintiff's reporting activities were a contributing factor in the retaliatory actions taken against Plaintiff.

186. An employer or any other person or entity that violates Labor Code § 1102.5 is guilty of a misdemeanor punishable, in the case of an individual, by imprisonment in the county jail not to exceed one year or a fine not to exceed one thousand dollars ($1,000) or both that fine and imprisonment, or, in the case of a corporation, by a fine not to exceed five thousand dollars ($5,000).

187. Labor Code § 1105 further provides that "[n]othing in this chapter" shall prevent an employee's suit for damages.

188. By reason of the continuous nature of CDCR's discriminatory and retaliatory conduct, which persists to date, Dr. Jespersen is entitled to application of the continuing violations doctrine to all violations alleged herein.

189. CDCR's actions and failures to act have caused Dr. Jespersen to suffer harm,

including without limitation lost earnings, lost benefits, lost future employment opportunities, and other financial losses, as well as humiliation, embarrassment, emotional and physical distress, and mental anguish.

190.   Because of CDCR's conduct, Dr. Jespersen is entitled to all legal and equitable remedies available for violations of California Labor Code 1102.5.

## COUNT XI
**Violation of FEHA, Failure to Prevent Harassment, Discrimination, and Retaliation Cal. Govt. Code Section 12940(k)**
**(Against CDCR)**

191.   Dr. Jespersen re-alleges and incorporates each and every allegation contained in this Complaint.

192.   During the course of her employment, Dr. Jespersen was subjected to harassment, discrimination, and retaliation by CDCR.

193.   Despite Dr. Jespersen's complaints about the harassment, discrimination, and retaliation she faced, CDCR failed to take all reasonable steps to prevent and remedy the conduct of Officer McDaniels and others at CDCR.   To the contrary, CDCR empowered Officer McDaniels and other employees to harass, discriminate against, and retaliate against Dr. Jespersen.

194.   CDCR's conduct has been deliberate, willful, oppressive, malicious, fraudulent, and conducted in callous disregard of Dr. Jespersen's rights.   The adverse employment action decisions were made, approved, and ratified by officers and managing agents of CDCR, including CEO Jackie Clark, Chief of Mental Health David Silbaugh, Chief of Psychiatry Joan Gerbasi, Investigative Services Unit Lieutenant Anthony Lee, Warden Robert Fox and Associate Warden Dan Cueva.

195.   By reason of the continuous nature of CDCR's discriminatory conduct, which persists to date, Dr. Jespersen is entitled to application of the continuing violations doctrine to all violations alleged herein.

196.   CDCR's actions and failures to act have caused Dr. Jespersen to suffer harm, including without limitation lost earnings, lost benefits, lost future employment

opportunities, and other financial losses, as well as humiliation, embarrassment, emotional and physical distress, and mental anguish.

**PRAYER FOR RELIEF**

Wherefore, Dr. Jespersen requests the following relief:

a.  Acceptance of jurisdiction of this case;

b.  A declaratory judgment that the practices complained of herein are unlawful) infringed on Dr. Jespersen's protected free speech and equal protection rights in violation of the First and Fourteenth Amendments to the United States Constitution; as well as rights secured under 42 U.S.C. § 2000e, *et seq.*, as amended; 29 U.S.C. § 2601, *et seq.*; 29 U.S.C. § 206, *et seq.*; California Government Code § 12940, *et seq.*; California Government Code Sections 12945.1 and 12945.2, *et seq.*; and the California Labor Code 1102.5, *et seq.*;

c.  A permanent injunction against CDCR and its partners, officers, owners, agents, successors, employees, representatives and any and all persons acting in concert with them, from engaging in any further unlawful practices, policies, customs and usages set forth herein;

d.  An Order requiring CDCR to initiate and implement programs that (i) remedy the hostile work environment at CDCR; (ii) ensure prompt, remedial action regarding all claims of harassment; and (iii) eliminate the continuing effects of the discrimination and retaliatory practices described herein;

e.  An Order restoring Plaintiff to her rightful position at CDCR, or in lieu of reinstatement, an order for front pay benefits;

f.  Nominal damages;

g.  Back pay, front pay, lost benefits, liquidated damages, and other damages for lost compensation and job benefits suffered by Plaintiff in accordance with proof presented at trial;

1

       h.      Compensatory damages in an amount in accordance with proof presented

2

             at trial;

3

       i.       Exemplary and punitive damages (where available) in an amount

4

             commensurate with CDCR's ability to pay and to deter future conduct;

5

       j.       An award of litigation costs and expenses, including reasonable

6

             attorneys' fees to Dr. Jespersen;

7

       k.      Pre-judgment and post-judgment interest; and

8

       l.       Such other and further relief as the Court may deem just and proper.

9

10

11

Dated: August 14, 2017                Respectfully Submitted,

12

13

_____

14

Felicia Medina

15

Felicia Medina

16

Jennifer Orthwein

MEDINA ORTHWEIN LLP

17

18

*Attorneys for Plaintiff Lori Jespersen*

19

20

21

22

23

24

25

26

27

28

---

COMPLAINT FOR DAMAGES, PENALTIES, AND INJUNCTIVE RELEIF